**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BLUEFIELD DIVISION**

**LATONIA DEBORAH BYARD,**

     **Plaintiff,**

**v.**                              **Case No.: 1:15-cv-11836**

**CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,**

     **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The matter is assigned to the Honorable David A. Faber, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 7, 8).

The undersigned has fully considered the record and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that the final decision of the Commissioner be **REVERSED;** this matter be **REMANDED** for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g); and this action be

1

**DISMISSED, with prejudice,** and removed from the docket of the Court.

**I.    Procedural History**

On August 14, 2012, Plaintiff, Latonia Deborah Byard ("Claimant"), completed an application for DIB, alleging a disability onset date of July 16, 2012, due to "Fibromyalgia, depression, irritable bowel syndrome, edema in legs and feet and hands, [and] GERD [gastroesophageal reflux disease]." (Tr. at 198, 236). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 119-23, 129-35). Claimant filed a request for an administrative hearing, (Tr. at 136), which was held on February 4, 2014, before the Honorable Anne V. Sprague, Administrative Law Judge ("ALJ"). (Tr. at 74-93). By written decision dated March 14, 2014, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 63-73). The ALJ's decision became the final decision of the Commissioner on June 8, 2015, when the Appeals Council denied Claimant's request for review. (Tr. 1-4).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 1). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings, (ECF Nos. 5, 6), and both parties filed memoranda in support of judgment on the pleadings. (ECF Nos. 7, 8, 9). Consequently, the matter is fully briefed and ready for resolution.

**II.    Claimant's Background**

Claimant was 37 years old at the time she filed the instant application for benefits, and 40 years old on the date of the ALJ's decision. (Tr. at 71, 198). She completed high school and one year of college, and primarily communicated in English. (Tr. at 71, 235, 237). Claimant had past relevant work as a child support

technician, eligibility worker, phlebotomist, and bank teller. (Tr. at 237).

**III.** **Summary of ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 404.1520. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments

prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the fifth and final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at every level in the administrative review," including the review performed by the ALJ. 20 C.F.R. § 404.1520a. First, the ALJ evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* § 404.1520a(b). If such impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is

not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 404.1520a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 404.1520a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual function. *Id.* § 404.1520a(d)(3).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2016. (Tr. at 65, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since July 16, 2012, the alleged date of disability onset. (*Id.,* Finding No. 2). Although Claimant had worked after that date, the ALJ concluded that Claimant's work did not rise to the level of substantial gainful activity under the Social Security Act. At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "obesity, fibromyalgia, essential hypertension, depression and anxiety." (Tr. at 65, Finding No. 3).

Under the third inquiry, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 65-67 Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform less than a full range of light work as defined in 20 C.F.R. § 404.1567(b). She can lift/carry 20 pounds occasionally and 10 pounds frequently, stand/walk for 6 hours in an 8-

5

hour workday, and sit for 6 hours in an 8-hour workday. She can frequently finger bilaterally. She can only occasionally climb, balance, stoop, kneel, crouch, and crawl. She should avoid concentrated exposure to unprotected heights or dangerous equipment, temperature extremes, humidity and wetness, vibration, dusts, chemicals or fumes. Due to pain and psychological symptoms, she is limited to simple routine work.

(Tr. at 67-71, Finding No. 5). At the fourth step, the ALJ established that Claimant was unable to perform any past relevant work. (Tr. at 71, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with her RFC to determine her ability to engage in substantial gainful activity. (71-72, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1974 and was defined as a younger individual age 18-49; (2) she had at least a high school education and could communicate in English; and (3) transferability of job skills was not material to the disability determination. (Tr. at 71, Finding Nos. 7-9). Taking these factors and Claimant's RFC into account, and with the assistance of a vocational expert, the ALJ determined that Claimant could perform jobs that existed in significant numbers in the national economy. (Tr. at 72, Finding No. 10). Specifically, at the unskilled light exertional level, Claimant could work as a routing clerk, sales attendant, or cashier. (Tr. at 72). Therefore, the ALJ found that Claimant was not disabled as defined in the Social Security Act, and was not entitled to benefits. (Tr. at 72-73, Finding No. 11).

## IV.   **Claimant's Challenge to the Commissioner's Decision**

Claimant argues that the decision of the Commissioner is not supported by substantial evidence for three reasons. First, the ALJ erred in her RFC assessment and corresponding hypothetical question to the vocational expert. At step 3 of the sequential process, the ALJ found that Claimant had mental impairments resulting in

moderate difficulties in maintaining concentration, persistence, or pace. Claimant contends that, despite making such a finding, the ALJ failed to include limitations in the RFC assessment that accounted for the impairments and failed to include them in the controlling hypothetical question posed to the vocational expert. (ECF No. 7 at 6-7). Instead, the ALJ attempted to address Claimant's deficits in concentration, persistence, or pace by restricting her to "simple routine work," which clearly did not adequately address Claimant's inability to stay on task and focus.

Second, Claimant argues that the ALJ improperly weighed the treating source opinions provided by Dr. Anthony Rasi, who stated that Claimant could not work full time and could not perform work activities that required more than the sedentary level of exertion. (*Id.* at 7-9). According to Claimant, the ALJ failed to provide good reasons for rejecting Dr. Rasi's opinions, and identified no "persuasive contrary evidence" that would justify her decision to assign little weight to the RFC assessment of Claimant's treating physician.

Finally, Claimant asserts the ALJ erred in her credibility analysis. (*Id.* at 9-13). Claimant alleges that fibromyalgia is the primary cause of her disability, and although the ALJ acknowledged Claimant's affliction with that condition, the ALJ did not comply with Social Security Ruling ("SSR") 12-2p, which supplies agency direction on how fibromyalgia should be treated in disability evaluations. Claimant contends that the ALJ disregarded the waxing and waning nature of fibromyalgia and its impact on daily activities, resulting in an RFC that did not fully account for Claimant's symptoms of pain and fatigue.

In response, the Commissioner maintains that the ALJ properly identified jobs that Claimant was capable of performing, finding that she was not disabled under the

Act. (ECF No. 8 at 17-19). Even though the ALJ found Claimant had moderate limitations in maintaining concentration, persistence, or pace, the ALJ gave great weight to state agency psychologist, Dr. Smith, who found Claimant had only mild, nonsevere mental limitations. Thus, a restriction to simple, routine work was adequate to account for Claimant's functional limitations. Regarding Dr. Rasi's opinions, the ALJ found them to be inconsistent with the overall medical record and with Claimant's daily activities, which were acceptable reasons for discounting the opinions. Finally, the Commissioner notes that the ALJ followed the proper two-step process when assessing Claimant's statements regarding the persistence, severity, and limiting effects of her symptoms. Therefore, the ALJ's decision is supported by substantial evidence and should be affirmed.

## V.   **Relevant Medical History**

While the undersigned has reviewed all evidence of record, only the medical information most relevant to the disputed issues is summarized below:

### A.  *Treatment Records*

On February 2, 2011, Claimant presented to Anthony D. Rasi, D.O., with complaints of headache, cough, and sore throat. (Tr. at 401-02). A review of systems was also positive for edema of the feet, fatigue, dizziness, and stiffness. Claimant was diagnosed with fatigue, fibromyalgia, GERD, obesity, vitamin D deficiency, seasonal allergies, and hyperlipidemia. (Tr. at 402).

Claimant retuned to Dr. Rasi on April 29, 2011 with complaints of sinus pressure and eight days of swollen and painful feet, with the pain travelling up to her knees. (Tr. at 399-400). Claimant's medication regimen included Savella, Reglan, Dimeprazola, Lasix, Phenergan, and Lortab. A review of systems was positive for fibromyalgia,

edema of feet, and fatigue. Claimant's physical examination was unremarkable other than bilateral edema of the lower legs and feet. She had full range of motion in all extremities. Her skin was warm and dry with no rash or lesions. Claimant was assessed with diffuse edema and fibromyalgia. Dr. Rasi prescribed an increase in Savella and Lasix but, otherwise, the medication regimen stayed the same. (Tr. at 400).

A few days later, Claimant underwent a bilateral lower extremities venous duplex Doppler examination at Bluefield Regional Medical Center. (Tr. at 427). C. Richard Daniel, Jr., M.D., interpreted the study as negative, with no evidence of intraluminal thrombus. Claimant's veins had normal spontaneous flow, movement, and compressibility.

On May 5, 2011, Claimant presented to the Emergency Department of Bluefield Regional Medical Center with complaints of severe weakness, fatigue, and dizziness with hypokalemia. (Tr. at 451-54). Claimant's stated that her dosage of Lasix had been increased, and she began to feel extremely fatigued with cramps in her lower extremities that traveled up to her arms. Claimant's potassium level was found to be extremely low. Claimant was given oral medication and released, but she returned to the hospital feeling very ill with severe weakness and faintness, continued nausea, leg pain, and cramps. On examination, Claimant's extremities revealed 1+ pitting edema of the pretibial area into the ankles and feet. Claimant had no fasciculations; however, she had multiple trigger points due to fibromyalgia. Her muscle strength and tone were intact with radial and pedal pulses equal bilaterally. Claimant's skin had no rashes or lesions. She walked with a stable gait. Claimant was assessed with multiple muscle cramps, generalized fatigue, and weakness, most likely due to severe hypokalemia from diuretic use; fibromyalgia with chronic pain; venous insufficiency with increased leg

edema; history of peritonsillar abscess; extreme fatigue; Vitamin D deficiency; hyperlipidemia; and obesity. (Tr. at 453).

Claimant returned to Dr. Rasi on May 9, 2011. (Tr. at 395-96). Claimant reported she was feeling much better, with improvement in her leg cramps and myalgias. She had no new complaints. Dr. Rasi examined Claimant and found no peripheral edema. She demonstrated full range of motion of her extremities. Claimant was assessed with hypokalemia, venous insufficiency, fibromyalgia, hyperlipidemia, obesity, GERD, and seasonal allergies.

On May 11, 2011, Claimant presented to Bluefield Regional Medical Center for an ultrasound of her thyroid due to elevated TSH. (Tr. at 423). John G. Kahler, M.D., interpreted the study to be normal, with normal echo architecture of the thyroid gland and no evidence of nodules. (Tr. at 423).

Claimant returned to Dr. Rasi on May 12, 2011 with complaints of severe edema to her face, hands, and legs. (Tr. at 393-94). Claimant requested a refill of pain medication, which was denied. Dr. Rasi documented that Claimant had not brought the prescription bottle to the appointment, and he required patients to bring their bottle of Lortab with them before he would prescribe a refill. Claimant's diagnosis remained unchanged, with Dr. Rasi indicating the edema was arthritic related.

On August 3, 2011, Ihsan O. Safi, M.D., conducted a consultative examination of Claimant at the request of Dr. Rasi due to chronic edema and possible Cushing's syndrome. (Tr. at 456-57). Dr. Safi noted that Claimant had a history of chronic edema requiring large doses of diuretics, a Vitamin D deficiency, fibromyalgia, GERD, and premature menopause secondary to a complete hysterectomy seven years prior. On examination, Claimant's body mass index measured thirty-five and her blood pressure

was 118/80. Claimant's thyroid was slightly enlarged with no distinctive nodule. Her heart, lungs, abdomen, and skin were unremarkable, and she had no evidence of pitting edema of the extremities. Dr. Safi diagnosed Claimant with intermittent chronic edema, obesity, fatigue, premature surgical menopause, hyperlipidemia, and hypothyroidism as reported by Claimant. Dr. Safi indicated that he would perform an overnight dexamethasone suppression test, but did not feel that Claimant had Cushing's syndrome. He advised Claimant to cut back on salt intake and provided her with a 1500 calorie diet. Dr. Safi felt Claimant might benefit from estrogen replacement therapy and a short course of appetite suppressor. (Tr. at 457).

Claimant returned to Dr. Rasi on September 7, 2011 with complaints of coughing, wheezing, congestion, shortness of breath, lumbar pain, and burning sensation in her lungs for the past week. (Tr. at 391-92). On examination, Claimant had no leg edema. Claimant had full range of motion of her extremities and lumbar spine. Her strength was intact. Claimant was assessed with upper respiratory infection and lumbar pain. She returned two days later for follow-up reporting she felt worse with continued respiratory symptoms. (Tr. at 389-90). A chest x-ray was performed that day at Bluefield Regional Medical Center. (Tr. at 420). Howard Heller, M.D., interpreted the x-ray as normal. Claimant reported to Dr. Rasi on September 12, 2011 that she did not feel any better. (Tr. at 387-88). On examination she exhibited a harsh, rattling cough, but she had no evidence of leg edema, and her range of motion of the extremities was normal.

Claimant returned to Dr. Rasi on March 5, 2012 with complaints of nasal congestion, pain and pressure in her face and jaws, cough, and sore throat. (Tr. at 385-86). Claimant was prescribed Lortab and a Medrol pak. Claimant returned one month

11

later on April 2 with continued upper respiratory complaints. (Tr. at 383-84). On examination, she exhibited a rattling cough. That same day, Claimant presented to Community Radiology for a chest x-ray. (Tr. at 419). Vijay Ramakrishnan, M.D., found the soft tissues, osseous structures, mediastinal and cardiac silhouettes to be unremarkable, and her lungs were clear.

On June 7, 2012, Claimant returned to Dr. Rasi with complaints of multiple myalgias, pressure, and dysuria. (Tr. at 381-82). She told him Savella was not helping anymore with her symptoms. A review of systems was positive for dysuria, arthritis, arthralgias, edema to feet and legs, fatigue, and insomnia.

Claimant returned to Dr. Rasi on July 24, 2012 complaining of increased pain, which caused her to miss two days of work per week. (Tr. at 379-80). The pain centered in her back, legs, and hips. She also had sinus pressure, congestion, and ear pain. An examination revealed multiple tender points of the chest, back, abdomen, legs, and hips. Claimant's strength was intact, as were her radial and pedal pulses bilaterally. Dr. Rasi documented that Claimant was applying for disability. He suggested rehabilitation if she showed no improvement in three to five days. (Tr. at 380).

On August 13, 2012, Claimant reported to Dr. Rasi that her fibromyalgia pain had increased, causing her to miss work and ultimately quitting her job. (Tr. at 377-78). The pain was located in her back, hips, legs and feet. She also complained of increased sinus congestion, as well as increased edema. Claimant requested a referral to Dr. Kenneth O'Rourke. On examination, Claimant had mild pretibial edema bilaterally, along with multiple trigger points due to fibromyalgia. No skin rashes or lesions were seen. Claimant was referred to a rheumatologist. (Tr. at 378).

On September 17, 2012, requesting prescription

12

refills and disability paperwork. (Tr. at 375-76). She complained of sinus congestion. A review of systems was positive for arthritis, arthralgias, edema to feet and hands, fatigue, insomnia, and headaches. Her current medications included Lortab, Reglan, Promethazine, Savella, Furosemide, Nexium, Desyrel, and Vitamin D. On examination, Claimant had no lymphadenopathy or edema to the extremities. She demonstrated 4/5 strength in the upper and lower extremities bilaterally. Claimant was assessed with fibromyalgia, debilitating pain, obesity, GERD, irritable bowel syndrome ("IBS"), Vitamin D deficiency, fatigue, chronic sinusitis, swelling of the left digit with pain, questionable gout versus fibromyalgia, and hyperlipidemia. Dr. Rasi reviewed the disability papers with Claimant and prescribed antibiotics for her sinus infection. (Tr. at 376). She returned to Dr. Rasi on September 26, October 29, November 7, and November 21, 2012, to discuss lab results. (Tr. at 373-74, 372, 370-71, 369). Dr. Rasi felt that Claimant needed regular laboratory monitoring due to her elevated liver enzymes, increased cholesterol, and "high risk" medications. (Tr. at 369).

Claimant presented to Kamalesh Patel, M.D.  on December 4, 2012, in follow-up to a prior examination in November 2010. (Tr. at 641-46). Claimant complained of epigastric pain for the past two months accompanied by nausea and IBS. A review of systems was positive for headaches, post nasal drip, abdominal pain, nausea, vomiting, regurgitation, muscular pain and weakness, joint pain and stiffness, and depression. (Tr. at 644). Dr. Patel examined Claimant, noting that her abdomen was obese, soft, and tender in the epigastric area. However, there were no palpable masses, and her bowel sounds were normal in all four quadrants. Claimant was alert and appeared to be "emotionally stable." She had no edema or cyanosis of the extremities. Dr. Patel scheduled an EGD, increased her dosages of Reglan and Nexium, and advised Claimant

13

to limit her use of caffeine and soda. (Tr. at 645). The following day, Claimant underwent an EGD which revealed mild distal esophagitis, Grade 1, with slightly irregular Z line; small hiatal hernia; and mild gastritis. (Tr. at 404). After reviewing the results, Dr. Patel told Claimant to continue taking Nexium, discontinue Reglan, and add Zantac to her medication regimen.

Claimant presented to Bluefield Regional Medical Center two days later on December 6 with complaints of abdominal pain following the EGD. (Tr. at 329-32). A review of systems was positive for chills, generalized weakness, abdominal pain, and anxiety; however, was negative for back pain, cramps, joint pain, extremity pain, myalgias depression or altered mental status. (Tr. at 329). An abdominal x-ray was negative. Claimant was admitted with an assessment of acute gastrointestinal bleed and acute abdominal pain. (Tr. at 332). A CT scan of the abdomen was performed on December 7 and showed evidence of a prior cholecystectomy, but was otherwise unremarkable. (Tr. at 346). The following day, Claimant underwent an upper gastrointestinal endoscopy which revealed trace distal esophagitis, small hiatal hernia, trace gastritis, and no evidence of bleeding. (Tr. at 333-34). On December 10, 2012, Claimant underwent a lower gastrointestinal endoscopy which revealed normal visualized mucosa and no active bleeding. (Tr. at 335). Claimant was discharged that day stable and improved. Claimant was provided prescriptions for Reglan, Crestor, Promethazine, Savella, Nexium, Lasix, Lortab, Desyrel, Lamisil and Orbivan. (Tr. at 317-18).

Claimant returned to Dr. Rasi on December 19, 2012 with complaints of headache, sinus drainage and pressure. (Tr. at 367-68). Claimant reported Orbivan did help ease her headaches. On January 15, 2013, Claimant complained to Dr. Rasi of sore

throat and left otalgia. (Tr. at 365-66). On examination, Claimant's range of motion in all extremities was unrestricted. Her skin was intact. Dr. Rasi assessed Claimant with sinusitis, seasonal allergies, fibromyalgia, status post gastrointestinal bleed, GERD, Vitamin D deficiency, fatigue, obesity, and history of smoking.

Claimant returned to Dr. Rasi on February 26, 2013 with complaints of excessive swelling, pain in shoulders, headache, cough, otalgia, sore throat and worsening GERD. (Tr. at 470-71). On examination, Claimant's extremity strength and movement were intact, although she showed decreased range of motion in her shoulders due to fibromyalgia. Radial and pedal pulses were 2+ bilaterally. No edema was noted. An examination of Claimant's remaining musculoskeletal system revealed that her strength and movement were intact. Her diagnoses remained unchanged. On April 25, 2013, Claimant told Dr. Rasi her shoulder pain had increased. (Tr. at 468-69). She also reported that the pain and swelling in her hands had gotten worse. Dr. Rasi noted on May 23, 2013, that Claimant had skin discoloration in addition to edema. (Tr. at 466-67). Her main complaints at this visit involved bronchitis, headache, and sore throat.

On June 11, 2013, Claimant was examined by William Gruhn, M.D., for a rheumatology consultation. (Tr. at 499-501). She was being evaluated for complaints of pain in the shoulders, hands, legs, and feet; fatigue; anxiety and depression; and edema of the hands, legs, and feet. (Tr. at 499). Claimant reported cold and over exertion made her pain worse, while heat and rest eased the pain. Claimant complained of trouble sleeping, averaging two to three hours of sleep per night. In addition, she had become "extremely anxious" at night, although she was unsure of the cause. Her husband and son had taken over most of the household duties as she could no longer

take care of things. Claimant complained of numbness and tingling in her hands and feet, weakness in her arms and legs, frequent frontal headaches, and short-term memory problems. Dr. Gruhn examined Claimant. He observed that she was in no distress and had a normal mood and affect. Her gait was antalgic at times, and she had a reticular rash on her legs. Her low back was tender. Claimant's ankle jerks were normal, but her other reflexes were diminished. Her elbows were tender at the ulnar groove, and her ankles were slightly swollen and tender, with large fat pads at the lateral ankles. Dr. Gruhn did not appreciate any additional joint swelling of the peripheral joints. Claimant's posterior neck and shoulders were tender. Dr. Gruhn assessed Claimant with diffuse muscular pain, probably due to fibromyalgia. He felt a cryptic underlying inflammatory disease, such as mild SLE or myositis should be considered, in addition to statin muscle toxicity. He acknowledged, however, that Claimant had only been taking statins for three months. In addition, he diagnosed Claimant with GERD, sleep disorder, and reticular rash on legs possibly related to use of a heating pad or potential inflammatory disease. (Tr. at 500). Claimant was instructed to have laboratory work done, to continue taking Savella, to consider stopping Crestor, to try Amitriptyline one or two hours before sleep, and to return in a few weeks.

Claimant returned to Dr. Gruhn on July 2, 2013. (Tr. at 551-52). She reported feeling a "little better" since her last visit. The addition of Amitriptyline to her medication regimen helped with sleep issues; however, Savella did not provide significant relief of her other symptoms. Claimant complained of constant pain and fatigue, rating the pain seven out of ten on a ten-point pain scale. She also complained of swollen hands and ankles along with morning stiffness. Claimant reported feeling

16

anxious and depressed. On examination, Claimant appeared in no distress, and was oriented with a normal mood and affect. Her gait was normal. She was markedly tender at the neck, shoulders, and upper back. (Tr. at 551). Dr. Gruhn found no evidence of inflammatory arthritis. Claimant was assessed with fibromyalgia. She was advised to continue taking Savella, Elavil, and Lortab. Dr. Gruhn advised Claimant to engage in regular exercise. (Tr. at 552). The laboratory results revealed negative rheumatoid factor.

Claimant returned to Dr. Rasi on September 16, 2013 with complaints of shoulder pain, sinus pressure, tingling and numbness of her hands at night, and anxiety attacks. (Tr. at 570-71). Claimant reported to Dr. Rasi on November 1, 2013 that she had pain in her cheeks down to her neck, swollen ankles, pain in the left shoulder, otalgia, headache, sore throat, rash and urinary incontinence. (Tr. at 568-69). At this visit, Claimant's medication regimen included Savella, Singulair, Lortab, Vitamin D, Dexilant, Reglan, Lasix, Crestor, Promethazine, Amitriptyline, and Ativan. On examination, Claimant's distal pulses were good and no edema of the extremities was noted. She had pain on palpation of all joints and body parts due to fibromyalgia. The strength in Claimant's lower extremities measured 5/5 and 3/5 in the upper extremities. Dr. Rasi noted pain during active and passive movement of Claimant's left shoulder. He assessed Claimant with acute sinusitis, anxiety, GERD, fibromyalgia, history of smoking, seasonal allergies, increased lipids, Vitamin D deficiency, obesity, fatigue, LFT, and nocturia. Claimant was advised to increase Elavil and was provided prescriptions for Vibba tablets, Medrol Pak, and Tussonex. (Tr. at 569).

On January 9, 2014, Claimant underwent an x-ray of the lumbar spine at Teleradiology Specialists. (Tr. at 662-63). The x-ray revealed vertebral bodies normal

in appearance with good visualization of pedicles and spinous processes. The intervertebral disc spaces were well maintained. No compression fracture or spondylolisthesis was seen. The soft structures were unremarkable.

Claimant returned to Dr. Rasi on January 13, 2014 for follow-up on complaints of lumbar pain. (Tr. at 655-56). A review of systems was positive for nocturia, rashes on lower legs, arthritis, arthralgias, myalgias, toe cramps, numbness and edema, fatigue, insomnia, occasional constipation, and diarrhea. On examination, Claimant had no leg edema, although a rash was noted over her bilateral lower legs from the knees to the ankles. The lumbar spine showed decreased range of motion with pain on forward flexion and twisting, and pain on palpation with mild spasms mid and lower lumbar spine. The straight-leg test was negative.  Claimant was assessed with low back pain/strain, skin rash and discoloration to lower legs, fibromyalgia, GERD, Vitamin D deficiency, and hyperlipidemia. (Tr. at 656).

On February 20, 2014, Claimant complained to Dr. Rasi of a headache on the left upper scalp. (Tr. at 653-54). Her prescribed medications at that time included Norco, Lorazepam, Amitriptyline, Dexilant, Crestor, Vitamin D, and Flexural. On examination, Claimant had no leg edema, and her extremities had normal muscle tone. However, her muscle strength was decreased bilaterally, measuring 3/5. Claimant had positive trigger points due to fibromyalgia. Her sensory and motor sensations were intact and her pain on palpation was decreased at the right medial knee, although mild edema was present. Dr. Rasi ordered an x-ray of the right knee, which was performed the same day at Community Radiology of Virginia. (Tr. at 660). Qasim Rao, M.D., interpreted the film as showing no acute fracture or subluxation, but moderate narrowing of the medial tibiofemoral joint compartment, with marginal osteophyte

formation, and a small suprapatellar joint effusion.

On March 13, 2014, Claimant presented to the dermatology clinic at Wake Forest Baptist Medical Center regarding a rash on her legs present for the past year. (Tr. at 676-77). Claimant reported to Sarah Taylor, M.D., that the rash did not itch; however, she had pain in her legs, along with swelling, for which she took Lasix daily. A cardiovascular workup four years earlier was negative. Claimant stated that she had not received any treatment for the rash. Claimant's primary care physician had ordered laboratory tests for lupus, which were negative. Claimant also complained of fatigue, a rash on her shoulders with exposure to the sun, joint pain and swelling primarily in the fingers and ankles, and dry mouth. Dr. Taylor assessed Claimant with livedo reticularis, rule out an associated connective tissue disease; comedonal acne; and keratosis pilaris. Dr. Taylor ordered laboratory work to determine if there was any associated connective tissue disorder. She prescribed tretinoin cream and CeraVa SA, and instructed Claimant on the need to take precautions from sun exposure. (Tr. at 677).

### B. Evaluations and Opinions

Elizabeth Jennings, M.A., performed a psychological evaluation of Claimant on November 8, 2011 at the request of the West Virginia Department of Health and Human Resources. (Tr. at 303-10). Claimant complained of problems falling asleep and intermittent wakening, crying spells, fatigue, depressed mood, racing thoughts, rumination, generalized anxiety symptoms, and unresolved bereavement over the death of her mother several years earlier. (Tr. at 303). Claimant denied post-traumatic stress symptoms, psychosis, and obsessive, compulsive symptoms. Claimant was questioned about her development and social history. (Tr. at 304). She described a

good childhood and a supportive marriage with a sixteen-year-old son. Claimant told Ms. Jennings she had obtained a business degree and attended two years of college. At that time, Claimant was employed as a benefit program specialist with Tazewell County, Virginia, working over forty hours per week. Although her job was occasionally stressful, Claimant reported getting along well with her co-workers and supervisors. (Tr. at 304).

With respect to health care and mental health treatment, Claimant told Ms. Jennings she did not have any past or current inpatient or outpatient psychiatric treatment. She had a history of stomach cancer and a diagnosis of fibromyalgia, which caused fatigue. Claimant had undergone several surgeries in her past, including removal of her gall bladder and appendix, as well as a complete hysterectomy. (*Id.*). She was currently prescribed Lortab and Savella for fibromyalgia.

Ms. Jennings performed a mental status examination of Claimant. (Tr. at 305). Claimant was cooperative with normal psychomotor behavior. She made good eye contact and was not distracted during the examination. Claimant presented coherent responses with normal speech. She was oriented in all four spheres. Her mood was mildly dysphoric with a broad affect. Claimant's insight and judgment were within normal limits, as was her immediate, recent, and remote memory. Ms. Jennings noted that Claimant was a good historian. Claimant reported her social functioning as "generally o.k.," although she had difficulty related to her fibromyalgia.

Ms. Jennings administered the Pain Patient Profile (P-3), the Beck Anxiety Inventory (BAI), and the Beck Depression Inventory. Claimant appeared to approach the tests honestly, and Ms. Jennings felt that the results could be interpreted with confidence. On the Pain Profile, Claimant scored sleep issues, pain, fatigue, and health

problems as severe. The overall profile revealed moderate pain symptoms and mild to moderate anxiety and depressive symptoms. On the BAI, Claimant's overall score of eighteen fell within the moderate range of symptoms. Claimant's overall score on the Beck Depression Inventory was fifteen, which again was within the moderate range of symptoms. (Tr. at 306). Ms. Jennings opined that Claimant was functioning between 60 and 65 on the Global Assessment of Functioning Scale.[1]

Ms. Jennings assessed Claimant with generalized anxiety disorder; depressive disorder, not otherwise specified, and pain disorder associated with both psychological factors and a general medical condition. Ms. Jennings commented that Claimant had a significant history for stomach cancer and chronic pain issues, and she displayed significant anxiety and depression. She opined that Claimant's psychiatric symptoms were "serious in nature" and were "currently not stabilized." (Tr. at 307). Ms. Jennings believed Claimant would benefit from further evaluation for both medical and psychiatric symptoms. Ms. Jennings predicted that additional stress would likely result in Claimant's decompensation, and she felt that Claimant would not be able to continue to work in her present condition without assistance.

On December 11, 2012, Tammie L. Smith, M.A., performed a mental health disability determination examination. (Tr. at 348-53). Claimant arrived early for the

---

[1] The Global Assessment of Functioning ("GAF") Scale is a 100-point scale that rates "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," but "do[es] not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic Statistical Manual of Mental Disorders*, Am. Psych. Assoc., 34 (4th ed. text rev. 2000) ("DSM–IV*")*. On the GAF scale, a higher score correlates with a less severe impairment. The GAF scale was abandoned as a measurement tool in the latest edition of the *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2013) ("DSM–5"), in part due to its "conceptual lack of clarity" and its "questionable psychometrics in routine practice." DSM–5 at 16. A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM–IV at 34.

examination and was described as cooperative and polite. Her posture and gait were within normal limits, and she displayed no need for assistive devices. (Tr. at 348). Claimant reported a history of fibromyalgia, depression, irritable bowel syndrome, edema of the extremities, GERD, and anxiety. She told Ms. Smith that her impairments caused her to lose focus, preventing her from concentrating and staying on task, and causing her to feel constantly overwhelmed and nervous. (Tr. at 349). Her other symptoms included decreased sleep, varied appetite, anxiety, feelings of dread, and an inability to relax.

Ms. Smith performed a mental status examination. (Tr. at 351). Claimant was oriented in all spheres, with a dysphoric mood and normal affect. Claimant's speech was relevant and coherent, although she did not speak spontaneously. Her thought process was not impaired. Claimant's judgment was average, and her insight was good. Claimant's immediate and remote memory was within normal limits; however, her recent memory was moderately deficient based upon recall of two out of four words upon a thirty-minute interval with distraction tasks. Concentration, persistence, and pace were within normal limits. Claimant appeared adequately sociable with fair eye contact; however, Claimant indicated that she did not have much social interaction. She denied involvement in community activities and had stopped attending church approximately one year earlier. Claimant told Ms. Smith she used to read as a hobby, but now she found she could not concentrate very well. Claimant said she typically stayed at home and kept to herself, although she had one friend with whom she maintained contact. Claimant was assessed with depressive disorder, not otherwise specified; generalized anxiety disorder; and pain disorder associated with both psychological factors and general medical condition. Ms. Smith opined that Claimant's

prognosis was fair to good for psychiatric symptoms with psychiatric follow-up recommended. (Tr. at 352).

On December 27, 2012, Rakesh Wahi, M.D., completed a consultative physical examination for the West Virginia Disability Determination Service. (Tr. at 356-60). Claimant alleged fibromyalgia, depression, IBS, edema of the extremities, and GERD. Claimant told Dr. Wahi that she had stopped working six months earlier due to fibromyalgia. Claimant described having pain over most of her body and joints that prevented her from walking farther than one quarter mile and from sitting more than fifteen to twenty minutes at a time. Claimant spent most of the day lying in bed, which she indicated was the most comfortable position. Claimant also reported having problems with buttoning clothing and holding a pen for a lengthy period of time. Claimant stated that she could sign her name, but was unable to do any other type of fine manipulation. Claimant also experienced generalized fatigue, which caused her to feel depressed and made activities unenjoyable. (Tr. at 356).

Dr. Wahi performed a physical examination, noting that Claimant appeared slightly depressed. However, she had a normal gait and station and could get on and off the examination table independently. Claimant was able to partially squat, albeit with pain. She was able to walk on her heels and toes, again with some pain. Her extremities were well perfused, with no cyanosis or clubbing, and there was no evidence of significant atrophy or hypertrophy. Claimant has 1+ pedal edema bilaterally. Her sensation and reflexes were normal, and her grip strength measured 12 in both hands. Claimant demonstrated normal range of motion of the shoulders, elbows, wrists, hips, knees and ankles, bilaterally, although the movements triggered pain. She could fully extend, make fists, and oppose the fingers of both hands. Her

upper extremity and grip strength measured 5/5 bilaterally. Claimant's fine manipulation was noted to be impaired, as she was unable to hold a pen for long periods of time. An examination of her spine was normal, with a normal range of motion of the cervical and lumbar spine, as well as normal straight-leg raising bilaterally. Dr. Wahi assessed Claimant with obesity, fibromyalgia, hypertension, and GERD. (Tr. at 358-59). He opined that Claimant suffered with symptoms of GERD despite treatment with Nexium. She also had generalized aches and pain with symptoms of fatigue causing her to be bedridden. Dr. Wahi noted most of Claimant's allegations consisted of symptoms that were subjective and could not be corroborate by objective evidence.

On December 27, 2012, Paula J. Bickham, Ph.D., completed a Psychiatric Review Technique. (Tr. at 99-100). Claimant was being evaluated for affective, anxiety-related, and somatoform disorders. Dr. Bickham found Claimant had mild restrictions of activities of daily living; maintaining social function; concentration, persistence or pace. She had no episodes of decompensation, nor did the evidence establish the presence of paragraph "C" criteria. (Tr. at 99). Dr. Bickham felt Claimant appeared mostly credible. Dr. Bickham noted that even though Claimant did not have a mental health history, she was taking psychotropic medication as prescribed by her primary care physician. A recent consultative mental status examination indicated that Claimant functioned normally in all domains, except her recent memory was impaired when measured using a thirty-minute interval which, according to Dr. Bickham, was not standard protocol. For that reason, Dr. Bickham did not give the impaired memory result much weight. Dr. Bickham concluded that while Claimant's physical and pain issues appeared to limit her activities of daily living, her mental impairments were non-

24

severe. (Tr. at 100).

Rogelio Lim, M.D., completed a Physical Residual Functional Capacity evaluation on January 15, 2013. (Tr. at 100-02). He found Claimant could occasionally lift fifty pounds; frequently lift twenty-five pounds; stand, walk and sit about six hours in an eight-hour workday; and had unlimited ability to push and/or pull. Dr. Lim found Claimant had postural limitations in that she could occasionally climb ramps, stairs, ladders, ropes, or scaffolds, balance, stoop, kneel, crouch or crawl. Claimant had no manipulative, visual or communicative limitations. She did have environmental limitations and should avoid concentrated exposure to extreme cold or heat, wetness, humidity, vibration, fumes, odors, dusts, gases, poor ventilation and hazards, such as machinery or heights. Claimant had unlimited exposure to noise. Dr. Lim found that Claimant's allegations were not fully credible. He pointed out that although Claimant alleged fibromyalgia, there was no indication in the record of active inflammation. Dr. Lim also concluded that Claimant's IBS and GERD were not disabling. He did not find Claimant's obesity to be a complicating factor, noting that she was fully ambulatory with normal station and gait. Dr. Lim felt that Claimant's multiple allegations were exaggerated and out-of-proportion to the objective findings.

Curtis Withrow, M.D., completed a Physical Residual Functional Capacity Examination on February 20, 2013. (Tr. at 113-15). He found Claimant could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand, walk or sit six hours in an eight-hour workday; and had unlimited ability to push and/or pull. (Tr. at 113). Claimant could occasionally climb ramps, stairs, ladders, ropes, and scaffolds, balance, stoop, kneel, crouch and crawl. (Tr. at 113-14). As for manipulative limitations, Claimant was unlimited in reaching any direction, handling

and feeling; however, she was limited to frequent fingering and fine manipulation. Dr. Withrow supported this finding by evidence in the record of significant limitation in duration in fine manipulation. Claimant had no visual or communicative limitations. She was to avoid concentrated exposure to extreme cold, heat, wetness, humidity, vibration, fumes, odors, dusts, gases, poor ventilation and hazards, such as machinery or heights; however, she could sustain unlimited exposure to noise. As for Claimant's fibromyalgia, Dr. Withrow noted multiple trigger points had been identified by Claimant's physician, but Dr. Withrow questioned the number of trigger points. (Tr. at 114-15).

Rosemary L. Smith, Psy.D., completed a Psychiatric Review Technique on February 22, 2013. (Tr. at 111-12). Dr. Smith found Claimant to have medically determined impairments of affective disorder, anxiety-related disorder and somatoform disorder. Claimant had mild restrictions in her activities of daily living; maintaining social function; concentration, persistence, or pace. Claimant had no episodes of decompensation. There was no evidence of paragraph "C" criteria. (Tr. at 112-12). Thus, Dr. Smith concluded that Claimant's mental impairments were non-severe. (Tr. at 112).

On February 20, 2014, Anthony Rasi, D.O., completed a Medical Assessment of Ability To Do Work-Related Activities (Physical). (Tr. at 634-37). Dr. Rasi opined that Claimant was restricted in her ability to lift and/or carry to occasional lifting and/or carrying of up to five pounds and frequently lifting and/or carrying of up to three pounds. He supported this assessment with evidence of Claimant's decreased range of motion in her shoulders, as well as the decreased grip strength in her hands and fingers. Dr. Rasi opined that Claimant was limited to standing and/or walking for less

than two hours in an eight-hour workday, seven to ten minutes without interruption. He supported this opinion with evidence of Claimant's soreness and stiffness of her back area on spinal straightening and her fibromyalgia. Dr. Rasi added that walking triggered Claimant's back pain and caused her to suffer severe feet, leg, and knee pain. (Tr. at 634). Dr. Rasi opined that Claimant could sit for less than three hours in an eight-hour workday, up to twenty minutes without interruption. Dr. Rasi explained that when Claimant sat for a long period of time, she experienced swelling in her knees, feet, and legs; thus, she required frequent changes in position. (Tr. at 635). He believed Claimant should never climb, kneel, or crawl and could only occasionally balance, stoop, or crouch. Dr. Rasi noted with regard to balance that Claimant had a limp due to knee pain and swelling. Moreover, if Claimant were to stoop or crouch, she probably would not be able to get up without assistance. Dr. Rasi supported these opinions with his findings of Claimant's fibromyalgia trigger points, weakness, and decreased range of motion. Dr. Rasi added that Claimant could be exposed to humidity; however, she should not be exposed to heights, temperature extremes, chemicals, dust, noise, fumes, or vibrations. Dr. Rasi explained that heights would cause dizziness and walking up heights would cause back, leg, and knee pain. Cold temperature could cause Claimant to experience muscle spasms and all-over aches and joint pain. Chemicals, dusts, and fumes would induce allergies and breathing problems. Noise and vibration would cause anxiety, agitation, and nervousness. Dr. Rasi opined that as Claimant's fibromyalgia worsened, she would feel worse, triggering increased nervousness as well as a need for increased medication. (Tr. at 635-36). Dr. Rasi found Claimant to have manipulative limitations in reaching in all directions, (left shoulder pain made worse), and handling and fingering (decreased grip strength with the right hand being weaker).

27

(Tr. at 636). He added that Claimant could occasionally reach, handle, finger, and frequently feel. Claimant's reaching was limited due to pain and soreness of the shoulders and decreased range of motion. Her handling was limited due to decreased grip strength. Dr. Rasi stressed that Claimant's grip strength had been tested at 3/5 in both hands. He also found Claimant to have the visual impairment of astigmatism in both eyes, which required her to wear glasses and made it difficult for her to drive at night. Her hearing and speaking were normal. Dr. Rasi opined that all of Claimant's activities of daily living were affected by fibromyalgia, stating that this condition caused problems with typing, using a computer, or lifting due to numbness in the arms and fingers and swelling in the fingers; an inability to focus on the computer screen due to neck and shoulder strain; and problems lifting heavy stacks of files. Dr. Rasi concluded that Claimant's standard workday would be affected by her limitations in standing, sitting, walking, reading, focusing, concentrating and task completion given that Claimant was unable to fully perform any of these functions because of her medical conditions. Dr. Rasi also opined that Claimant's impairments would make it difficult for Claimant to obtain or maintain employment. (Tr. at 637).

## VI.   Scope of Review

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson,* the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

28

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a de novo review of the evidence to ascertain whether the claimant is disabled. Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001)). Instead, the Court's role is limited to insuring that the ALJ followed applicable regulations and rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.   Discussion

Claimant's three challenges to the Commissioner's decision involve the sufficiency of the RFC finding and hypothetical question in addressing Claimant's moderate limitations in concentration, persistence, or pace; the treatment of Dr. Rasi's medical source opinions; and the propriety of the symptoms assessment. Each challenge will be addressed in turn.

### A. The ALJ's RFC Finding and Controlling Hypothetical Question

In her first challenge, Claimant asserts that the ALJ's RFC finding failed to adequately address her moderate difficulties in maintaining concentration, persistence, or pace. Claimant contends that the ALJ erred by neglecting to include any limitations in the RFC finding and the corresponding hypothetical question posed to the vocational expert, which specifically accounted for Claimant's inability to focus and stay on task. For support, Claimant primarily relies on the Fourth Circuit's decision in *Mascio v. Colvin,* 780 F.3d 632 (4th Cir. 2015).

In *Mascio*, the ALJ determined at step three that the claimant experienced

moderate difficulties in maintaining concentration, persistence, or pace; however, the ALJ failed to include any mental limitations in the controlling hypothetical question presented to the vocational expert. 780 F.3d at 637-38. While the vocational expert supplied a list of jobs that were unskilled, the Fourth Circuit found that this was insufficient to account for the claimant's moderate mental limitations and held that "an ALJ does not account 'for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work.'" *Id.* at 638 (quoting *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011)). The court indicated that "the ability to perform simple tasks differs from the ability to stay on task. Only the latter limitation would account for a claimant's limitation in concentration, persistence, or pace."[2] *Id.* Because the ALJ failed to either include any mental limitation in the RFC or explain why a "moderate limitation in concentration, persistence, or pace at step three d[id] not translate into a limitation" in the ALJ's RFC finding, the Fourth Circuit found that remand was appropriate. *Id.*

The same issue was subsequently addressed by this Court in *Jackson v. Colvin*, No. 3:14-cv-24834, 2015 WL 5786802, at *4-*5 (S.D.W.Va. Sept. 30, 2015). There, the ALJ found that the claimant experienced moderate deficiencies in concentration, persistence, or pace. *Id.* at *1. Attempting to take this limitation into account, the ALJ restricted the claimant to work involving simple tasks and instructions; however, the Court recognized that this was inadequate under *Mascio*. *Id.* at *4. The Court explained the principle espoused in *Mascio*: "If the ALJ found [the claimant] had moderate mental limitations related to concentration, persistence, or pace—which here the ALJ

---

[2] Listing 12.00 explains that "[c]oncentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings." 20 C.F.R. § 404, Subpart P, App. 1, ¶ 12.00(C)(3).

found—the ALJ should have either included those limitations in the hypothetical or explained in the RFC assessment why, despite finding these moderate mental limitations, it was unnecessary to include them in the hypothetical. Failure to do so requires remand." *Id.* Because the ALJ did neither, the Court found that remand was appropriate.[3] *Id.* at *5.

In contrast, this Court concluded that *Mascio* did not require remand in *Evans v. Colvin*, No. 14-cv-29072, 2016 WL 1258491 (S.D.W.Va. Mar. 30, 2016). In *Evans*, the ALJ found that the claimant experienced moderate limitation in concentration, persistence, or pace at step three. 2016 WL 1258491, at *5. The ALJ's RFC finding limited the claimant to simple, routine tasks, and the Court agreed that this restriction accurately reflected the claimant's mental ability. *Id.* In describing the standard for reviewing an argument under *Mascio*, the Court observed that "[w]here the medical evidence shows that a claimant can carry out simple tasks, an ALJ's hypothetical to the vocational expert to that effect will sufficiently account for a claimant's moderate limitation in maintaining concentration, persistence, and pace." *Id.* (quoting *Hurst v. Comm'r of Soc. Sec.*, 522 F. App'x 522, 525 (11th Cir. 2013)) (markings omitted). The Court determined that the claimant's mental health treatment records and the opinion of a state agency medical consultant supported the ALJ's finding that the claimant could perform simple, routine tasks, despite moderate limitation in concentration, persistence, or pace. *Id.* In the end, the Court concluded that "the ALJ explained why [the claimant's] moderate limitation in concentration, persistence, or pace at step three d[id] not translate into a limitation in [the claimant's] residual functional capacity,

---

[3] The Court noted that "what was pivotal in *Mascio* was not the claims or evidence presented in the agency proceeding, but the ALJ's finding [of moderate difficulties in concentration, persistence, or pace]." *Jackson*, 2015 WL 5786802, at *4.

beyond restricting [the claimant] to unskilled work." *Id.*

The undersigned also recently examined the Fourth Circuit's *Mascio* decision on two occasions. First, in *Bailey v. Colvin*, the ALJ concluded at step three that the claimant suffered from moderate difficulty in maintaining concentration, persistence, or pace as a result of his depressive disorder and alcohol abuse, but "curiously downplayed [the claimant's] mental imitations when assessing his RFC." No. 5:14-cv-29435, 2015 WL 9595499, at *16 (S.D.W.Va. Dec. 4, 2015). The only restriction that the ALJ included in the RFC finding to account for the claimant's moderately deficient concentration, persistence, or pace was to eliminate jobs that involved detailed or complex instructions. *Id.* However, in light of *Mascio*, the undersigned found that this limitation did "not appear to directly address [the claimant's] ability to stay on task," and furthermore, "the ALJ never explained how that limitation, alone, was sufficient in [the claimant's] case." *Id.* Compounding the error, the ALJ's analysis of the claimant's mental limitations was "fractured and confused." *Id.* at *17. Ultimately, the undersigned recommended that the Commissioner's decision be reversed because "the ALJ's conclusion that [the claimant] could perform work involving simple instructions 'on a sustained basis' did not adequately address his determination that [the claimant] labor[ed] under moderate difficulties in concentration, persistence, or pace," and the ALJ "failed to sufficiently explain and resolve th[e] apparent conflict." *Id.*

Second, the undersigned recommended remand based on *Mascio* in *Graham v. Colvin*, No. 3:14-cv-27280, 2015 WL 7752620 (S.D.W.Va. Nov. 13, 2015). In that case, the claimant argued that the ALJ's controlling hypothetical failed to account for the moderate difficulties in concentration, persistence, or pace that the ALJ found step three. *Id.* at *21. The undersigned agreed that the ALJ's RFC finding, which limited the

claimant to simple, routine, and repetitive tasks, did not sufficiently address the claimant's limitations in concentration, persistence, or pace because "the ability to perform simple tasks differs from the ability to stay on task." *Id.* at *22 (quoting *Mascio*, 780 F.3d at 638). Furthermore, because the ALJ "failed to sufficiently explain why additional limitations were not included in the RFC finding given his determination that Claimant labored under these moderate difficulties," the undersigned found that the Commissioner's decision should be reversed. *Id.*

Here, like the decisions discussed above, the ALJ explicitly found at step three of the sequential process that Claimant suffered from a moderate limitation in maintaining concentration, persistence, or pace. (Tr. at 66). However, the ALJ did not offer any rationale or evidentiary support for her conclusion that Claimant was moderately limited, nor did the ALJ clarify in the written decision how Claimant's limitation manifested functionally. Instead, the ALJ proceeded to conduct the RFC assessment by addressing Claimant's mental impairments only in broad terms. At no point in the discussion did the ALJ ever explain how Claimant's moderate deficiency in maintaining concentration, persistence, or pace affected her ability to perform basic work-related activities. Furthermore, no medical source or consultant completed a mental RFC assessment that outlined the impact of Claimant's deficits in maintaining concentration, persistence, or pace on a function-by-function basis. As a result, the factual support for the limitation, the functional effect of the limitation on Claimant's ability to work, and the reason for the restriction ultimately included in the RFC finding are all mysteries.

In her RFC analysis, the ALJ reviewed the reports of Claimant's examining psychologists, but offered no insight into how their findings ultimately informed her

RFC assessment. Indeed, no logical bridge was constructed between the consultants' findings and the ALJ's RFC assessment. To the contrary, the evidence discussed by the ALJ undermined her finding of a moderate limitation. The ALJ mentioned Claimant's report to Ms. Smith that she "lost focus" and was "not able to concentrate and stay on task," but the ALJ added that both psychologists determined Claimant's concentration to be within normal limits. (Tr. at 70). The ALJ provided no discussion, at all, regarding Claimant's persistence or pace, although Ms. Smith indicated in her report that Claimant's persistence and pace were within normal limits. The ALJ emphasized the examiners' additional findings that Claimant "had good eye contact, with no distractibility;" was fully oriented with normal thought processes; had good insight and average judgment; and had average social functioning. (*Id.*). The ALJ noted that Claimant's recent memory was found by Ms. Smith to be moderately deficient, but her immediate and remote memory was normal. Thus, taken as a whole, none of the consultants' findings discussed by the ALJ supported the conclusion that Claimant had a moderate limitation in maintaining concentration, persistence, or pace. In addition, the ALJ expressly rejected Ms. Jennings's opinion that Claimant was unable to work, pointing out that Claimant had only *mild* symptoms, was working at the time of the evaluation by Ms. Jennings, and was receiving no psychiatric treatment. Then, without identifying the evidence that supported her finding of a moderate limitation, the ALJ compounded the confusion by determining, without any further explanation or factual basis, that "[d]ue to pain and psychological symptoms," Claimant was "limited to simple, routine work." (Tr. at 67).

Given the lack of any obvious logical connection between the evidence, the ALJ's analysis, and the RFC assessment, the undersigned **FINDS** that the ALJ erred when

she failed to explain how Claimant's moderate limitation in concentration, persistence, or pace was addressed by limiting her to simple, routine work. As the Fourth Circuit recognized in *Mascio*, restricting a claimant to simple work alone does not typically account for a moderate limitation in concentration, persistence, or pace. *See Mascio*, 780 F.3d at 638 ("[T]he ability to perform simple tasks differs from the ability to stay on task. Only the latter limitation would account for a claimant's limitation in concentration, persistence, or pace."). When an ALJ finds that a claimant suffers from a moderate limitation in maintaining concentration, persistence, or pace, the ALJ must explain (1) how that limitation is addressed in the RFC finding, or (2) why the limitation does not require an additional restriction in the RFC finding. Not only did the ALJ fail to do either, but the record was likewise devoid of any mental function-by-function assessment that might have explained the ALJ's determination of Claimant's mental work-related limitations.

Furthermore, the analysis the ALJ did supply was perplexing, at best. The ALJ expressly considered the opinions of non-examining state agency consultants, and gave the opinions great weight. Yet, the two non-examining mental health consultants opined that Claimant had only mild limitations in concentration, persistence, or pace. Consequently, notwithstanding her explicit assignment of "great weight" to the non-examining medical source opinions, the ALJ did ***not*** adopt the opinions related to Claimant's concentration, persistence, or pace. Having determined, without explanation, that Claimant was moderately limited in this functional category—contrary to the consultant's opinions—the ALJ certainly should have thoroughly addressed Claimant's deficiencies in concentration, persistence, or pace in the RFC discussion and their functional impact. *See McDonough v. Comm'r, Soc. Sec. Admin.*,

No. SAG-15-1090, 2016 WL 2770875, at *3 (D. Md. May 13, 2016) (remanding Commissioner's decision where ALJ's step three discussion indicated mild or no limitations in concentration, persistence, or pace, but ALJ ultimately found moderate limitation and failed to explain how restricting claimant to unskilled and simple work accounted for claimant's difficulties in concentration, persistence, or pace); *Williamson v. Colvin*, No. 1:14CV884, 2016 WL 1735889, at *7-*8 (M.D.N.C. May 2, 2016) (recommending remand where ALJ found moderate limitation in concentration, persistence, or pace, despite medical opinion evidence indicating claimant was not limited in that functional area, and ALJ failed to explain how limiting claimant to simple, routine tasks with no "production pace work" addressed claimant's ability to stay on task). In the end, the ALJ wholly neglected to explain in any context how limiting Claimant to simple, routine work addressed her mental limitations.

The Commissioner argues that the ALJ's error was harmless, because two of the jobs identified by the vocational expert—cashier and sales attendant—have been described as "being able to be performed in a low stress/non-production environment." (ECF No. 8 at 18). However, to accept the Commissioner's position, the Court would first have to reassess Claimant's RFC finding and make determinations regarding the nature, extent, and impact of her mental functional limitations on the ability to perform work-related activities and then include restrictions in the RFC finding that would correspond to Claimant's limitations. In other words, the Court would be required to perform the analysis that the ALJ should have performed at the final steps of the sequential disability determination process. Such an exercise is not within the scope of this Court's authority. Because the ALJ's RFC discussion lacks an adequate explanation concerning Claimant's mental limitations, the undersigned cannot

36

conclude that the ALJ's decision at step five is supported by substantial evidence. *See Morgan v. Barnhart*, 142 F. App'x 716, 720-21 (4th Cir. 2005) ("The Commissioner can show that the claimant is not disabled only if the vocational expert's testimony that jobs exist in the national economy is in response to questions from the ALJ that accurately reflect the claimant's work-related abilities."). Accordingly, the undersigned **RECOMMENDS** that the Commissioner's decision be **REVERSED** and that this case be remanded so that the ALJ may reconsider, or elaborate on her discussion of, Claimant's mental restrictions.

### B. Treatment of Dr. Rasi's Opinions

Next, Claimant complains that the ALJ failed to comply with Social Security regulations and rulings by rejecting Dr. Rasi's medical source statement without providing good reasons and persuasive evidence to the contrary. (ECF No. 7). When evaluating a claimant's application for disability benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R. § 404.1527(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* § 404.1527(a)(2).

The regulations outline how the opinions of accepted medical sources will be weighed in determining whether a claimant qualifies for disability benefits. *Id.* § 404.1527(c). In general, the ALJ should give more weight to the opinion of an examining medical source than to the opinion of a non-examining source, and even greater weight to the opinion of a treating physician, because that physician is usually

most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *Id.* § 404.1527(c)(1)-(2). A treating physician's opinion on the nature and severity of an impairment may be afforded controlling weight when the following two conditions are met: (1) the opinion is well-supported by clinical and laboratory diagnostic techniques and (2) the opinion is not inconsistent with other substantial evidence. *Id.* When a treating physician's opinion is not supported by clinical findings, or is inconsistent with other substantial evidence, the ALJ may give the physician's opinion less weight. *Mastro v. Apfel,* 270 F.3d 171, 178 (4th Cir. 2001).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must analyze and weigh all the medical opinions of record, taking into account the following factors: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. 20 C.F.R. § 404.1527(c)(2)-(6). The ALJ must provide "specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record." SSR 96-2p, 1996 WL 374188, at *5 (S.S.A. 1996). "Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected ... In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." *Id.* at *4. On the other hand, when there is persuasive contrary evidence in the record, a treating physician's opinion may be rejected in whole or in part. *Coffman v. Bowen,* 829 F.2d 514, 517 (4th

Cir. 1987). Generally, the more consistent a physician's opinion is with the record as a whole, the greater the weight an ALJ will assign to it. *Id.* § 404.1527(c)(4). Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays*, 907 F.2d at 1456.

In this case, Claimant's family physician, Dr. Rasi, completed a Medical Assessment of Ability To Do Work-Related Activities (Physical) on February 20, 2014. (Tr. at 634-37). The form contained Dr. Rasi's opinions regarding Claimant's ability to lift, carry, sit, stand, walk, climb, balance, stoop, crouch, kneel, crawl; her environmental limitations; her manipulative limitations; and her visual/communicative limitations. The form was handwritten by Dr. Rasi, was detailed, and included medical findings to support his various assessments. The ALJ considered Dr. Rasi's RFC assessment as a whole and gave it "little weight." (Tr. at 71). The ALJ explained the "extreme level of limitation" described by Dr. Rasi was "inconsistent with the longitudinal record, including the claimant's course of treatment, failure to try other treatment modalities, as well as the claimant's reported activities." (*Id.*). The ALJ never specified what aspect of Claimant's course of treatment was inconsistent with Dr. Rasi's opinions. Moreover, she never identified what other treatment modalities were available or offered to Claimant, and which of Claimant's activities conflicted with the limitations identified by Dr. Rasi.

Thus, while the reasons given by the ALJ for rejecting Dr. Rasi's RFC assessment may indeed be "good" reasons, the undersigned again **FINDS** that the "cursory and conclusory analysis" provided by the ALJ is insufficient to allow meaningful review by this Court. *See Fox v. Colvin*, 632 F. App'x 750, 756 (4th Cir. 2015); *also Monroe v. Colvin,* ___ F.3d ___, 2016 WL 3349355, at *11 (4th Cir. Jun. 16, 2016) (finding that the

ALJ's failure to specify what evidence and medical treatment contradicted a consultant's opinion precluded meaningful review and required remand). Given the undersigned's recommendation that this matter be remanded to address Claimant's mental RFC finding, the undersigned further **RECOMMENDS** that, on remand, the ALJ provide specific evidentiary support, with citations to the record, for the weight given to Dr. Rasi's opinions.

### C. Symptom Assessment

Finally, Claimant contends that the ALJ erred in assessing the credibility of Claimant's statements regarding the persistence, severity, and limiting effects of her symptoms. In particular, Claimant asserts that the ALJ failed to comply with SSR 12-2p, which discusses how to evaluate the symptoms of fibromyalgia. *Id.* 2012 WL 3104869 (S.S.A. Jul. 25, 2012) (ECF No. 7 at 11). Pursuant to 20 C.F.R. § 404.1529, the ALJ evaluates a claimant's report of symptoms using a two-step method. First, the ALJ must determine whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including pain. 20 C.F.R. § 404.1529(a). In other words, "an individual's statements of symptoms alone are not enough to establish the existence of a physical or mental impairment or disability." Social Security Ruling ("SSR") 16-3p, 2016 WL 1119029, at *2 (effective March 16, 2016).[4] Instead, there must exist some objective "[m]edical signs and laboratory findings, established by medically acceptable clinical

---

[4] The SSA recently provided guidance for evaluating a claimant's report of symptoms in the form of SSR 16-3p. In doing so, the SSA rescinded SSR 96-7p, 1996 WL 374186, which the parties relied on in their memoranda. The undersigned finds it appropriate to consider Claimant's challenge under the more recent Ruling as it "is a clarification of, rather than a change to, existing law." *Matula v. Colvin*, No. 14 C 7679, 2016 WL 2899267, at *7 n.2 (N.D. Ill. May 17, 2016); *see also Morris v. Colvin*, No. 14-CV-689, 2016 WL 3085427, at *8 n.7 (W.D.N.Y. June 2, 2016).

or laboratory diagnostic techniques" which demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. § 404.1529(b).

Second, after establishing that the claimant's conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* § 404.1529(a). If the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence, the ALJ must consider "other evidence in the record in reaching a conclusion about the intensity, persistence, and limiting effects of an individual's symptoms," including a claimant's own statements. SSR 16-3p, 2016 WL 1119029, at *5-*6. In evaluating a claimant's statements regarding his or her symptoms, the ALJ will consider "all of the relevant evidence," including (1) the claimant's medical history, signs and laboratory findings, and statements from the claimant, treating sources, and non-treating sources, 20 C.F.R. § 404.1529(c)(1); (2) objective medical evidence, which is obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, *id.* § 404.1529(c)(2); and (3) any other evidence relevant to the claimant's symptoms, such as evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and any other factors relating to functional limitations and restrictions due to the claimant's symptoms. *Id.* § 404.1529(c)(3); *see also Craig*, 76 F.3d at 595; SSR 16-3p, 2016 WL 1119029, at *4-*7. In *Hines v. Barnhart*, the Fourth Circuit stated that:

> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges he suffers.

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). The ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations; however, the lack of objective medical evidence may be one factor considered by the ALJ. SSR 16-3p, 2016 WL 1119029, at *5.

SSR 16-3p provides further guidance on how to evaluate a claimant's statements regarding the intensity, persistence, and limiting effects of his or her symptoms. For example, the Ruling stresses that the consistency of a claimant's own statements should be considered in determining whether a claimant's reported symptoms affect his or her ability to perform work-related activities. *Id.* at *8. Likewise, the longitudinal medical record is a valuable indicator of the extent to which a claimant's reported symptoms will reduce his or her capacity to perform work-related activities. *Id.* A longitudinal medical record demonstrating the claimant's attempts to seek and follow treatment for symptoms may support a claimant's report of symptoms. *Id.* On the other hand, an ALJ "may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record," where "the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints," or "the individual fails to follow prescribed treatment that might improve symptoms." *Id.*

Ultimately, "it is not sufficient for [an ALJ] to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been

considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.' It is also not enough for [an ALJ] simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the [ALJ] evaluated the individual's symptoms." *Id.* at \*9. SSR 16-3p instructs that "[t]he focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person"; rather, the core of an ALJ's inquiry is "whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities." *Id.* at \*10.

When considering whether an ALJ's evaluation of a claimant's reported symptoms is supported by substantial evidence, the Court does not replace its own assessment for those of the ALJ; rather, the Court scrutinizes the evidence to determine if it is sufficient to support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to the weight to be afforded to a claimant's report of symptoms, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

SSR 12-2P discusses, in relevant part, how the SSA will evaluate a claimant's statements about his or her symptoms when the claimant suffers from the medically determinable impairment of fibromyalgia. SSR 12-2P, 2012 WL 3104869, at *5. According to SSR 12-2P, the ALJ must follow the same two-step process that is used to assess the reliability of a claimant's statements in any circumstance. *Id.* However, at the second step of the two-step process, and particularly when considering statements as part of the RFC analysis, the ALJ must bear in mind that the symptoms of fibromyalgia can "wax and wane so that a person may have 'bad days and good days.'" *Id.* at *6. For that reason, consideration of the longitudinal record is especially important in cases involving fibromyalgia. *Id.*

In the instant case, the ALJ found Claimant's fibromyalgia to be a medically determinable impairment that caused more than minimal functional limitations. (Tr. at 65). The ALJ further found that Claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms described by Claimant. Nevertheless, "for the reasons explained in this decision," the ALJ did not believe that Claimant's symptoms were as severe, persistent, or limiting as she described them to be in her statements. (Tr. at 68). The ALJ then proceeded to summarize the longitudinal medical record. Although the summary was informative and certainly contained findings that arguably conflicted with claims of debilitating symptoms, the ALJ once more failed to link the evidence to specific reasons for discounting the reliability of Claimant's statements. Instead, the ALJ merely provided a recitation of the treatment record and apparently expected the reviewer to intuit her reasons. Clearly, vague and conclusory explanations are insufficient to allow meaningful review. *See Monroe,* ___ F.3d at ___, 2016 WL 3349355, at *11. Moreover, as the ALJ made no

44

mention of SSR 12-2p, the undersigned is unsure whether the ALJ took into consideration the waxing and waning nature of fibromyalgia when assessing the credibility of Claimant's statements. Therefore, the undersigned **FINDS** that the ALJ's symptoms assessment is insufficiently explained and **RECOMMENDS** that the issue be more fully addressed on remand.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **GRANT** Plaintiff's request for judgment on the pleadings, (ECF No. 7), to the extent that it requests remand of the Commissioner's decision; **DENY** Defendant's request to affirm the decision of the Commissioner, (ECF No. 8); **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this PF&R; and **DISMISS** this action, with prejudice, from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable David A. Faber, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding

District Judge for good cause shown. Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Faber and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** July 26, 2016

Cheryl A. Eifert
United States Magistrate Judge